**THIRD DIVISION**
**ELLINGTON, P. J.,**
**DILLARD and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 4, 2016**

# In the Court of Appeals of Georgia

A15A2275. ELLIOTT v. RESURGENS, P.C., d/b/a RESURGENS
ORTHOPAEDICS, et al.

DILLARD, Judge.

Sean Elliott appeals from a jury verdict in favor of Resurgens, P.C., d/b/a Resurgens Orthopaedics ("Resurgens") and Tapan K. Daftari, M.D. ("defendants"), in his medical-malpractice action against them, arising from allegedly negligent treatment that he received after undergoing spinal surgery (during which he became paralyzed from the waist down). In three separate enumerations of error, Elliott argues that the trial court erred in excluding the testimony of a witness who was not specifically named in the pre-trial order ("PTO") or disclosed during discovery. We agree that the trial court erred, and for the reasons set forth *infra*, reverse.

Construed in favor of the jury's verdict,[1] the evidence shows that, in 2004, Elliott began seeing Daftari regularly to receive medical treatment for neck and back pain. In late 2009, Elliott visited Daftari because he was experiencing increased pain in his neck and lower back. At that time, Daftari diagnosed Elliott with degenerative disc disease and informed him that he needed surgery on his posterior cervical spine. Thereafter, on December 1, 2009, Daftari performed the surgery, which went as planned with no complications, and Elliott was discharged three days later. At the time of his discharge, Elliott did not have any neurological deficits.

Approximately two weeks after the surgery, on December 15, 2009, Elliott's fiancé arrived home to find him "unconscious or in an altered state of consciousness," and he was immediately taken to the emergency room. By the time Elliott arrived at the hospital, he was in "very critical condition," and as a result, he was "intubated or placed on a ventilator . . . ." Cultures obtained from Elliott's surgical wound revealed that it was infected, and he was admitted to the hospital for post-operative treatment. Later that same evening, Daftari evaluated Elliott's wound and reviewed a CT scan that had been ordered by a radiologist. After doing so, Daftari believed that Elliott had "an abscess in the posterior cervical area of the post-op wound."

---

[1] *See, e.g.*, *Amu v. Barnes*, 286 Ga. App. 725, 725 (650 SE2d 288) (2007).

2

Elliott was initially treated with antibiotics, and the next day, December 16, 2009, Daftari performed a drainage procedure to clean out any infections in Elliott's surgical wound and neck. After this procedure, Elliott remained in the hospital for several days, during which time Daftari "assessed and examined" him daily. Then, on December 19, 2009, Elliott underwent another surgery to "make sure that there [was] nothing collected on [his] spinal cord again" and for "final closure" of his wound. And after this surgery, it seemed to Daftari that, overall, Elliott was "improving" and "that the infection was being conquered . . . ." Indeed, as of December 19 and 20, Elliott appeared to be "regaining his strength," and the operations appeared to be "helping him."

According to hospital records, on the morning of December 21, 2009, Daftari operated on another patient from 8:09 a.m. until 11:03 a.m., and afterwards, Daftari visited Elliott's hospital room around 11:30 a.m. In evaluating Elliott, Daftari discovered that he had decreased movement in his legs, but at that time, Daftari did not believe that it was an emergency or that Elliott had lost the use of his legs. Nevertheless, Daftari ordered a cervical magnetic resonance imaging ("MRI") of Elliott to be conducted "as soon as possible." While waiting on the cervical MRI

3

results, Daftari performed a second surgery that day on a different patient that lasted from 12:44 p.m. to 5:30 p.m.

At 5:20 p.m., a nurse notified Daftari that Elliott's temperature was increasing and that his inability to move his lower extremities was worsening. After Daftari's second surgery was completed, he visited Elliott's bedside some time before 6:00 p.m. As of this visit, Daftari had still not received the results of Elliott's cervical MRI from the radiologist, but when he eventually did, he learned that the MRI was negative and did not confirm the hematoma that he believed was the most likely cause of Elliott's decreased ability to move his legs. As a result, he ordered an MRI of Elliott's thoracic and lumbar spine, and the results of that MRI, which were released at 8:30 p.m., showed an expansion of Elliott's spinal cord, which causes compression of the spinal cord. Then, after consulting with a neurosurgeon, Daftari decided to perform a thoracic laminectomy, which is a surgery intended to make more room for Elliott's expanding spinal cord. Daftari performed the surgery that evening from around 9:30 p.m. until midnight, and in doing so, he discovered an abscess on Elliott's spinal cord. Ultimately, despite the surgery, Elliott was unable to recover any neurologic function, and he became paralyzed from the waist down.

Approximately two years later, on December 15, 2011, Elliott filed a medical-malpractice complaint against Resurgens and Daftari, alleging that his paralysis was caused by Daftari's negligent treatment of his post-operative spinal infection. And in late January 2012, Elliot filed an amended complaint to include an expert affidavit from Michael Dogali, a specialist in neurological surgery. Dogali averred, *inter alia*, that Daftari's failure to obtain timely imaging studies to rule out spinal-cord compression and abscess, his failure to timely evaluate Elliot, and his failure to timely and appropriately react to evaluations and testing proximately caused or significantly contributed to Elliott's resulting paraplegia. Resurgens and Daftari answered the complaint, denying liability and asserting numerous affirmative defenses. Then, after an extended discovery period, the case proceeded to a jury trial. At the conclusion of that trial, the jury returned a verdict in favor of Resurgens and Daftari, and the trial court entered a final judgment affirming its verdict. This appeal by Elliott follows.

In three separate enumerations of error, Elliott argues that the trial court erred in excluding the testimony of Savannah Sullivan, a nurse who worked at the hospital where Elliott was treated. Specifically, Elliott argues that the trial court erred in excluding this witness because (1) although Sullivan was not specifically named in the PTO, the PTO allowed both parties to call his medical providers, any person

named in the medical records, and any rebuttal witnesses; (2) he should have been allowed to amend the PTO to include Sullivan's name; and (3) the court was required to employ remedial measures other than the complete exclusion of Sullivan's testimony.

As a preliminary matter, we note that, contrary to Elliott's suggestion, the trial court did not exclude Sullivan's testimony on the basis that she was not specifically named in the PTO. Although the defense argued, *inter alia*, that Sullivan's testimony should be excluded on that basis, the court ultimately excluded her testimony because she was not identified or disclosed during the "extensive discovery that ha[d] been allowed in this case." And when Elliott later moved the trial court to reconsider this ruling, the court denied the motion, noting that its goal was to prevent "an unfair burden of surprise [when] there [had] been absolutely no disclosure of [Sullivan] at any time." Thus, because the trial court did not exclude Sullivan's testimony on the basis that Elliott failed to specifically name her in the PTO as a potential witness,[2] his

---

[2] It is worth noting that the PTO in this case provided that either party could call as a witness "[a]ny healthcare professional whose name appears in" Elliott's medical records, and as admitted by the defendants, Sullivan's name appears in those records in at least "a couple [of] places." Nevertheless, as discussed *supra*, the trial court's ruling to exclude Sullivan's testimony was not based on whether she was included by name in the PTO as a potential witness for the plaintiff.

6

first two enumerations of error have no bearing on the ruling being appealed, and we address only his third claim of error.

At the outset, we note that the admission of evidence is "within the sound discretion of the trial court and appellate courts will not interfere absent abuse of that discretion."[3] Nevertheless, we reiterate that evidence having a tendency to establish facts in issue is "relevant and admissible, and no matter how slight the probative value, our law favors admission of relevant evidence."[4]

In the case *sub judice*, Elliott's medical-malpractice claim was based entirely on Daftari's alleged delay in recognizing, investigating, and treating his thoracic abscess. And at trial, there was conflicting evidence regarding when Daftari first learned that Elliott had decreased ability to move his legs. Indeed, as previously noted, hospital records reflected that, on the morning of December 21, 2009, Daftari operated on another patient that day from 8:09 a.m. until 11:03 a.m. Additionally, Daftari testified that he was unaware Elliott was experiencing decreased movement

---

[3] *City of Atlanta v. Bennett*, 322 Ga. App. 726, 727 (1) (746 SE2d 198) (2013) (punctuation omitted); *accord Wells v. Roberts*, 225 Ga. App. 112, 114 (2) (483 SE2d 339) (1997).

[4] *Bennett*, 322 Ga. App. at 728 (1) (punctuation omitted); *accord Robert Stovall Family, L.P. v. Carroll Cty. Water Auth.*, 255 Ga. App. 223, 224 (564 SE2d 763) (2002).

in his legs until after that surgery at around 11:30 a.m., when he examined Elliott. But Elliott's medical records include an electronic entry, dated December 21, 2009 at 9:00 a.m., stating that Daftari was at Elliott's bedside and *was aware* that he was "unable to move bilateral lower extremities." And while Elliott's theory at trial was that Daftari's failure to act more quickly to discover and treat his condition resulted in his paralysis, his own expert conceded that, unless Daftari was aware of Elliott's worsening condition at 9:00 a.m., Daftari would not be "at fault." The defendants' experts agreed that the timing of when Daftari learned of Elliot's worsening condition was crucial. Specifically, they maintained that Daftari only became aware of Elliott's deteriorating condition around 11:30 a.m., and as a result, his treatment of Elliott met the applicable standard of care. Nevertheless, one of the defense experts admitted that, generally, "the earlier [a] thoracic abscess is diagnosed and treated, the better . . . ."

During his case-in-chief, Elliott called Daftari to testify for the purposes of cross-examination and asked him only one question: Whether he was at Elliott's bedside at 9:00 a.m. on December 21, 2009. When Daftari responded that he was not, Elliott then attempted to call Sullivan as his next witness. The defense objected, arguing that Sullivan's testimony should be excluded because her name was not

disclosed during discovery or listed in the PTO. According to Elliott, Sullivan was a nurse at the hospital where he had been treated, and she would testify that she was indeed with Daftari at Elliott's bedside at 9:00 a.m. on December 21, 2009. Ultimately, the trial court excluded Sullivan's testimony, even though it directly related to the material issue of when Daftari was first aware of Elliott's decreased ability to move his legs, because Elliott never disclosed her name during the lengthy discovery period.

As previously noted, Elliott now argues that the trial court's ruling was in error because it failed to employ less harsh remedial measures than complete exclusion of Sullivan's probative testimony. And Elliott is indeed correct that, in Georgia, "[e]xclusion of *probative* trial evidence is not an appropriate remedy for curing an alleged discovery omission."[5] In fact, this is true even when there is no excuse for a

---

[5] *Bennett*, 322 Ga. App. at 731 (1) (punctuation omitted); *accord Hunter v. Nissan Motor Co. of Japan*, 229 Ga. App. 729, 729 (1) (494 SE2d 751) (1997); *see also Hart v. Northside Hosp., Inc.*, 291 Ga. App. 208, 208 (661 SE2d 576) (2008) (noting that binding precedent holds that exclusion of evidence is not an appropriate remedy for curing a discovery omission). *But see Trustees of Trinity College v. Ferris*, 228 Ga. App. 476, 480 (6) (491 SE2d 909) (1997) ( "Exclusion of a witness is proper only where there has been a deliberate suppression of the witness' name." (punctuation omitted)). We note that, while the defendants argued to the trial court that Elliott intentionally withheld Sullivan's name during discovery in order to "ambush" them at trial, her name appeared in Elliott's medical records, which were available to both parties, as a nurse who treated him on December 21, 2009.

party's failure to "faithfully engage in discovery in compliance with [an] extended discovery deadline."[6] Instead, if the trial court believed that Elliott failed to properly comply with discovery, "the only appropriate remedy was postponement of trial or a mistrial."[7] As we have previously explained,

> [when] objection was made to the testimony of certain previously undisclosed witnesses, the proper procedure when they were called to testify was not to object to their testifying or to the admission of their testimony, but to move for a postponement of the trial for a sufficient length of time to enable the defendant to interview them, check the facts to which they would testify, and, if indicated, arrange to secure rebuttal evidence or to impeach them.[8]

Here, when Elliott called Sullivan to testify, the defendants did not move to postpone the trial or for a mistrial, but instead sought exclusion of her testimony because she had not previously been disclosed as a potential witness. In response to

---

[6] *Hart*, 291 Ga. App. at 209 (1).

[7] *Bennett*, 322 Ga. App. at 731 (1); *accord Thakkar v. St. Ives Country Club*, 250 Ga. App. 893, 894 (1) (b) (553 SE2d 181) (2001); *Hunter*, 229 Ga. App. at 730 (1).

[8] *Shepherd Interiors v. City of Atlanta*, 263 Ga. App. 869, 870 (1) (589 SE2d 640) (2003), *quoting Jones v. Atkins*, 120 Ga. App. 487, 491 (2) (171 SE2d 367) (1969); *see Hanna Creative Enterprises, Inc. v. Alterman Foods, Inc.*, 156 Ga. App. 376, 379 (2) (274 SE2d 761) (1980).

the defendants' concerns, Elliott suggested, as a curative measure, that the trial court allow the defendants to depose or question Sullivan before she testified. But the court declined to do so, noting that there was an agreed upon trial schedule, that there had already been significant setbacks in the proceedings, and that the court was working hard to keep the trial "on track." In light of the binding precedent set forth *supra*, the trial court abused its discretion in excluding Sullivan's probative and material testimony because doing so was not an appropriate remedy for Elliott's alleged failure to properly comply with discovery.[9]

---

[9] *See Bennett*, 322 Ga. App. at 731-32 (1) (reversing a jury verdict and granting a new trial because the trial court abused its discretion in excluding material testimony of a witness who had not been disclosed during discovery); *Infinite Energy, Inc. v. Cottrell*, 295 Ga. App. 306, 308-09 (2)(671 SE2d 294) (2008) (holding that the trial court did not abuse its discretion in denying a motion to exclude evidence that should have been disclosed during discovery when the moving party did not request a mistrial or a postponement and the alleged discovery violations did not authorize an evidentiary exclusion); *Hart*, 291 Ga. App. at 209-10 (1) (holding that the trial court abused its discretion in excluding testimony of experts who were untimely identified, noting that a party's failure to comply with discovery deadlines may not be remedied by the exclusion of probative trial evidence); *Hunter*, 229 Ga. App. at 730 (1) (holding that the only proper remedy for a party's failure to update discovery responses to include an expert witness was postponement of trial or a mistrial).

In concluding that Elliot is entitled to a new trial, we fully "recognize and deplore the significant burden that a retrial will impose, not only on the parties, but on the community as well."[10] Nevertheless, this Court must remain "steadfast in its commitment to safeguarding the sacrosanct and cherished right to a fair and impartial jury trial."[11] And in light of the trial court's clear abuse of its discretion in excluding relevant and material testimony in this case, we are constrained to reverse the jury's verdict and remand the case for a new trial.

*Judgment reversed and case remanded with direction. Ellington, P. J., and Mercier, J., concur.*

---

[10] *Six Flags Over Ga. II L.P. v. Martin*, 780 SE2d 796, 810 (3) (2015) (punctuation omitted).

[11] *Id.* (punctuation omitted).